## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

DR. ROBERT H. WAINBERG,

     *Plaintiff,*

v.

PIEDMONT UNIVERSITY,

     *Defendant.*

Civil Action File No.
2:19-cv-00251-MHC

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

### INTRODUCTION

1.     On May 11, 2018, after serving thirty years at Piedmont College (now Piedmont University), tenured biology professor Dr. Robert Wainberg was informed by President James Mellichamp that he was being terminated and in violation of Title IX due to comments he made in class. (*See* P-1, May 11 Notice ]of Termination Letter; Wainberg Dep. V.1 63:8-14.)

2.     President Mellichamp accused Dr. Wainberg of engaging in sexual harassment based on comments he made in class that are the subject of a tape recording. (*See* Mellichamp Dep. 294:1-25; Ex. P-1.)

3.     The students ("R.A." and Griffin Caracciolo) who were the subjects in the tape recording as well as the student Complainant (Jessica Smith) all have

1

provided sworn testimony denying that they ever observed Dr. Wainberg commit sexual harassment or a Title IX violation. (*See* P-2, Smith Aff.; P-3, "R.A." Aff.; P-4; Caracciolo Aff.; "R.A." Dep. 218-220.)

4.    President Mellichamp admits that being accused of a Title IX violation is a horrible stigma to a professional reputation, one that would cause himself extreme emotional distress and immense personal anguish. (Mellichamp Dep. 115:9-117:25.)

## THE TITLE IX PROCESS THAT WAS DUE THAT WAS NOT AFFORDED DR. ROBERT WAINBERG

5.    In exchange for federal funding, Piedmont University was required to adopt a Title IX policy that provided for an equitable grievance procedure of complaints under Title IX. (*See* Title IX 20 U.S.C. §1681; 34 C.F.R. § 106.8(b).)

6.    At the time of Dr. Wainberg's termination, the Title IX policy applicable was in Piedmont's Policies and Procedure Manual, Policy 3.16. (Ex. P-5 at Wainberg D-1389-1390, Title IX grievance policy; Allison Dep. 117:1-18; Sutton Dep. V.1 40:9-14; 158:24-159:2**.**)

7.    President Mellichamp admits that the college had to follow the Title IX policy because it was required under federal law. (Mellichamp Dep. 109:19-110:6.)

8.    It is undisputed that the governing Title IX policy at that time, was Piedmont University Grievance Policy 3.16(A) ("Harassment Policy") approved in

April 2016. It is undisputed that the policy stated, in part:

> A member of the faculty, staff, or student body has the right to report sexual harassment to the Affirmative Action Officer/Title IX Coordinator of the college (the Assistant Vice-President/for Finance and Human Resources) at titleIX@piedmont.edu. The Affirmative Action Officer/Title IX Coordinator, in consultation with the President or other officers of the college, may attempt to resolve this complaint in a manner satisfactory to the grievant. If the grievance cannot be resolved, the Affirmative Action Officer/ **Title IX Coordinator, in consultation with the President, shall appoint a Grievance Committee to hear the grievance. The committee will hear the grievance and advise the President of its recommendation in a fair, impartial and timely manner. The President will notify the grievant and the respondent in writing of the decision**.

> An appeal option was provided in Section 3.16(C) as follows: **Unsatisfied parties may appeal to the Chairman of the Board of Trustees, who will appoint a special committee of the board to hear and decide the grievance in a fair, impartial and timely manner.** The decision of the Special Committee of the Board is final.

> (Ex. P-5 at Wainberg D-1389-1390, Title IX grievance policy; Sutton Dep. V.1 162-165; Mellichamp Dep. 158:25-160:7.)

## PRESIDENT MELLICHAMP'S ADMISSIONS ABOUT TITLE IX POLICY REQUIREMENTS UNDER FEDERAL LAW REGARDING DUE PROCESS

9.      President Mellichamp admits that it has always been the case that the Title IX policy has a process in it that the college is obligated to follow upon receipt of a Title IX complaint, one that he was obligated to follow under federal law. ("Q Okay. And you've always had a Title IX policy that you were obligated, under federal law, that had a specific Title IX process that you were to follow upon

receiving a Title IX complaint, yes or no? A Yes.") (Mellichamp Dep. 113:21-114:14.)

10.    President Mellichamp testified that Title IX requires an "equitable grievance procedure" and that a part of this policy is to have a hearing. (Mellichamp Dep. 135:6-136:18.)

11.    President Mellichamp testified that appointing a Grievance Committee to hear the grievance was a requirement of the Title IX policy. (Mellichamp Dep. 165:9-166:6.)

12.    President Mellichamp testified that the Title IX policy of Piedmont University required the Grievance Committee to hear the grievance and advise the president of its recommendation in a fair, impartial, and timely manner. (Mellichamp Dep. 166:23-167:22.)

13.    President Mellichamp testified that the Title IX policy required the president to notify the grievant and the respondent, in writing, of the decision. (Mellichamp Dep. 166:23-167:22.)

14.    President Mellichamp testified that Piedmont University established this policy that required a specific Title IX process in compliance with federal law. (Mellichamp Dep. 166:23-167:22.)

15.    President Mellichamp testified that private colleges have a process that

is due both faculty and students under Title IX federal law and Piedmont had a policy that established that Title IX process that was due under federal law in May of 2018 when Dr. Wainberg was terminated. (Mellichamp Dep. 220:22-221:24.)

16.     President Mellichamp testified that the Title IX policy, as required by federal law, stated that if a grievance cannot be resolved, the Title IX Coordinator, in consultation with the President, shall appoint a Grievance Committee to hear the grievance. (Mellichamp Dep. 168:24-169:6.)

17.     President Mellichamp has testified that there is no doubt that this Title IX process that the college is obligated to follow is due employees and students that are accused of sexual harassment. (Mellichamp Dep. 301:19-302:25.)

**TITLE IX INVESTIGATOR ROSE MARIEE ALLISON'S ADMISSIONS ABOUT TITLE IX POLICY REQUIREMENTS UNDER FEDERAL LAW REGARDING DUE PROCESS THAT WERE NOT COMPLIED WITH**

18.     Despite this Title IX grievance policy existing that required a Grievance Committee hearing conducted in a fair, impartial, and timely manner, no Grievance Committee was ever appointed as admitted by the Title IX Investigator Rose Mariee Allison:

A. That is correct. And there was no grievance Title IX Grievance Committee appointed period.

(Allison Dep. 120:9-10.)

19.     Title IX Investigator/Director of HR Allison admits that she did not

comply with procedural requirements under Title IX. (Allison Dep. 293:23-294:2.)

20.    Title IX Investigator/Director of HR Allison admits that she believes the Title IX Coordinator, Ann Sutton was in over her head. (Allison Dep. 297:10-20.)

21.    Title IX Investigator/Director of HR Allison admits that for two weeks while the Title IX investigation was going on, no one provided Dr. Wainberg any notice that he was being investigated. (Allison Dep. 174:24-175:4.)

22.    Title IX Investigator/Director of HR Allison admits the Title IX investigators never showed Dr. Wainberg a copy of the complainant's complaints during the Title IX investigation interview or prior to interviewing him. (Allison Dep. 72:1-18.)

23.    Title IX Investigator/Director of HR Allison admits the Title IX Investigators did not provide Dr. Wainberg any written notice of the Title IX complaint of charges against him prior to interview, nor disclose the identities of any allegations against him, nor the witness identities, nor copies of the documents, nor any information so he could prepare in advance. (Allison Dep. 64:23-65:4, 87:2-14, 88:7-14, 164:1-9, 221:8-222:20.)

24.    In the Title IX investigation, there was no effort to obtain exculpatory evidence from other students who attended Dr. Wainberg's class. (Allison Dep.

168:9-12.)

25.     Title IX Investigator/Director of HR Allison does not know and is not familiar with whether the DOE requires equitable grievance procedures for colleges as a requirement for Title IX. (Allison Dep. 94:6-18.)

26.     Title IX Investigator/Director of HR Allison believes Piedmont was required to provide due process protection to a respondent charged with at Title IX violation. (Allison Dep. 86:12-18) but admits she never had Title IX training on the procedural protections afforded employees under Title IX. (Allison Dep. 47:17- 52: 8.)

27.     Title IX Investigator/Director of HR Allison admits that Dr. Wainberg was not given the policy prior to or during his Title IX investigation interview, and President Mellichamp instructed the Title IX Investigators and Title IX Coordinator not to provide him this document. (Ex. P-6, Mellichamp Email; Allison Dep. 192:1-16.)

28.     Title IX Investigator/Director of HR Allison states that she and Jim Peeples, as Title IX Investigators, did not render a recommendation, were not the Grievance Committee in charge of hearing the grievance, and, despite the Title IX policy requiring the Title IX Coordinator to appoint a Grievance Committee to hear the grievance, there was no grievance "period". (Allison Dep. 58:4-16, 118,

120:1-21.)

29.    The Title IX policy required a Title IX Coordinator in consultation with the President to appoint a Grievance Committee to hear the grievance and advise the President of its recommendation in a fair and impartial and timely manner, and allowed unsatisfied parties to appeal the decision where a special committee will be appointed to decide the grievance---nevertheless, none of this was done. (Allison Dep. 122:1-123:23, 186:11-187:7; Sutton Dep. V.1 91:5-12, 92:1-10, 92:17-21, 168:10-13, 175:20-176:2.)

30.    The Title IX investigation was stopped and never finished (Allison Dep. 124:10-16) and Title IX Investigator/Director of HR Allison admits the completion of the Title IX procedures did not occur. (Allison Dep. 263:6-264:14.)

31.    Title IX Investigator/Director of HR Allison admitted that Piedmont is required to provide the same equitable grievance procedures for the complainant as they are for respondents charged with a Title IX violation. (Allison Dep. 96:2-24.)

32.    Title IX Investigator/Director of HR Allison admitted that Complainant Jessica Smith, a female student, was entitled to greater equitable procedural protection compared to the respondent Dr. Wainberg a male, as the Title IX policy for students (unlike the one used for Wainberg) used a hearing model affording an ability to present witnesses, evidence and hold a hearing where Title IX procedures

for employees did not. (Ex. P-7, Student Handbook Title IX Policy; Allison Dep. 286:6-287:16, 223:17-21.)

33.    Title IX Investigator/Director of HR Allison admitted that Dr. Wainberg had no opportunity to rebut the evidence provided by "M.S." at his Title IX interview. (Allison Dep. 202:5-10.)

## TITLE IX COORDINATOR ANN SUTTON'S ADMISSIONS ABOUT TITLE IX POLICY REQUIREMENTS UNDER FEDERAL LAW REGARDING DUE PROCESS THAT WERE NOT COMPLIED WITH

34.    Title IX Coordinator Ann Sutton admitted that Dr. Wainberg had no Grievance Committee afforded to him or appeals process of the Title IX Grievance Committee.

> Q. Would you agree that there was no Grievance Committee that was afforded to Dr. Wainberg; correct?
> A. Yes.
>
> (Sutton Dep. V.1 175:20-176:2.)
>
> Q. And would you agree there was no appeals process of the Grievance Committee decision that was afforded to Dr. Wainberg; correct?
> MR. CHANCEY: Object to form.
> A. That is correct.
>
> (Sutton Dep. V.1 168:10-13.)

35.    Title IX Coordinator Sutton admits that Dr. Wainberg never received prior written notice about the Title IX investigation. (Sutton Dep. V.2 41:17-22,

42:3-22, 73:20-25, 78:24-79:9.)

36.    Title IX Coordinator Sutton agrees that schools are required by Title IX regulations to create prompt equitable grievance procedures. (Sutton Dep. V.1 145:23-146:1.)

37.    Title IX Coordinator Sutton admitted that she had received no Title IX training on what procedural protections employees are afforded under Title IX. (Sutton Dep. V.1 64:25-65:14.)

38.    Title IX Coordinator Sutton admits that it is the responsibility of the college receiving federal funds, that they adequately inform respondents of the grievance procedure pursuant grievance policies and procedures. (Sutton Dep. V.1 91:5-12; 92:1-10; 92:17-21.)

39.    Title IX Coordinator Sutton agrees that one of the elements to whether a school's grievance procedure is prompt and equitable includes adequate, reliable, impartial investigation of complaints including the opportunity to present witnesses and other evidence, and agrees with 2017 DOE OCR Q&A. (Sutton Dep. V.1 99:18-100:2; Ex. P-8, US DOE Title IX Resource Guide Apr 2015, Ex. P-9, US DOE Sept 2017 Q&A.)

40.    Title IX Coordinator Sutton believes complainants and respondents should receive equitable grievance procedures.

Q. Do you believe that complainants and respondents should receive equal grievance procedure? One shouldn't have more rights than the other. Both the complainant and the respondent should receive equal equitable grievance procedure?
A. Yes

(Sutton Dep. V.1 129:17-22.)

41.    Title IX Coordinator Sutton agrees that the decision-maker determining whether or not to take an adverse action against an employee charged with Title IX must take in all exculpatory and inculpatory evidence and agrees with 2017 DOE OCR Q&A. (Sutton Dep. V.1 101:14-19; 106:23-107:8; 126:23-25; Ex. P-8; Ex. P-9.)

42.    Title IX Coordinator Sutton agrees with the 2017 DOE OCR Q&A (Ex. P-9), which provides that once a college decides to open an investigation that may lead to disciplinary action against respondent that the college should provide written notice to that respondent of the allegations constituting a potential violation of the school's sexual misconduct policy, and admits Piedmont did not provide that to Dr. Wainberg. (Sutton Dep. V.1 102:2-11.)

43.    Title IX Coordinator Sutton agreed that once a school opens up a Title IX investigation that may lead to disciplinary action against a respondent that it "should provide written notice, to include sufficient details and with sufficient time to prepare a response before any initial interview takes place.? MR. CHANCEY:

Object to form. Q. I can repeat at any time if you need me to. A. Yes, we should have." (Sutton Dep. V.1 102:2:21.)

44.    Title IX Coordinator Sutton admits she never heard Dr. Wainberg admitting sexual harassment. "Q. You never heard Dr. Wainberg say that yes he did this or admit to sexual harassing anyone; correct? A. That is correct." (Sutton Dep. V.1 107:6-8.)

45.    Title IX Coordinator Sutton believes that "Do you believe that an accused individual needs the name of the accuser and the information regarding the nature of the allegations in order to defend himself against charges? A. I do." (Sutton Dep. V.1 143:24-144:2.)

46.    Title IX Coordinator Sutton also recommended monitoring and sensitivity training instead of termination of Dr. Wainberg. (Sutton Dep. V.2 95:9-22; 96:4-18; 97:10-18.)

47.    Title IX Coordinator Sutton agrees that once a school opens a Title IX investigation that leads to disciplinary action against a respondent, they should provide written notice to include sufficient details and with sufficient time to prepare a response before an initial interview takes place. (Sutton Dep. V.1 106:11-22, 131:16-21.)

48.    Title IX Coordinator Sutton agrees that a college should provide a

written notice with sufficient details that include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident. (Sutton Dep. V.1 104:7-17, 143:1-2.)

49.    Title IX Coordinator Sutton made a concerted effort to make sure Dr. Wainberg received a written policies explaining his rights under Title IX policy grievance procedure prior to his written interview, but President Mellichamp instructed her not to provide him those policies. (Sutton Dep. V.1 105:8-17; Ex. P-10, Mellichamp Email.)

50.    Title IX Coordinator Sutton agrees that in both public and private schools, additional or separate rights may be created for employees or students by state law, institutional regulations, and policies, such as faculty or student handbooks and collective bargaining agreements. (Sutton Dep. V.1 146:6-10.)

51.    Title IX Coordinator Sutton agrees that Piedmont's obligations under Title IX as they pertain to sexual harassment were to provide procedures that included equal opportunity for both parties to present witnesses and other evidence. (Sutton Dep. V.1 155:13-18.)

52.    On May 10, 2018, Title IX Coordinator Sutton sought advice from Judy Spain, Compliance Coordinator from the Georgia Independent Colleges

Association, in order to put together a recommendation for President Mellichamp on whether Dr. Wainberg violated Title IX, but President Mellichamp terminated Dr. Wainberg before receiving such recommendation. (Sutton Dep. V.2 91:24-92:13; Ex. P-11, Sutton and Spain Communications.)

53.    Nevertheless, and without his Title IX Coordinator (Sutton) or Investigators (Peeples and Allison) giving any recommendation or outcome determination concerning the Title IX investigation, on the morning of May 11, 2018, President Mellichamp handed Dr. Wainberg his termination letter informing him he was being terminated for being found in violation of Title IX (Ex. P-1.) "Q. But President Mellichamp does not wait to receive your Title IX recommendation letter; correct? A. Correct. Q. Instead, the very next morning he meets with Dr. Robert Wainberg and informs him that he is being terminated solely on the basis of a Title IX issue; correct? A. That's correct." (Sutton Dep. V.2 79:10-17.)

54.    Piedmont never provided Dr. Wainberg with any written notice prior to interviewing him or prior to terminating him; never informed Dr. Wainberg of the allegations he was charged with; never told Dr. Wainberg the identities of the parties accusing him so he could properly respond; never told Dr. Wainberg about what specific federal law he allegedly violated; never told Dr. Wainberg the precise policy he allegedly violated; never told Dr. Wainberg any date or location of any alleged

incident; and, never provided Dr. Wainberg with any written notice at any time:

> Q… you agree with me that either on that day or beforehand you never tell, as the Title IX investigator, you never tell Robert Wainberg of the misconduct he's been charged with; correct?
> A Correct.
> Q You never tell Robert Wainberg of the identities of the parties who are accusing him of anything; correct?
> A Correct.
> Q You never tell him about any kind of code of conduct or federal law he's violated; correct?
> A Correct.
> Q You never tell him about the precise conduct or any policy violation he's allegedly violated; correct?
> A Correct.
> Q You never tell him about any date and location of any alleged incidents; correct?
> A Correct.
> Q You don't provide any written notice, period; correct?
> A Correct.
> Q Okay. The first time you tell him anything is during his investigatory interview with you on May 9th; correct?
> A. Correct.

(Allison Dep. 175:15-176:15; *see also* Sutton Dep. V.2 41:17-22.)

## PRESIDENT'S ADMISSIONS REGARDING DUE PROCESS FAILURES

55.    President Mellichamp testified that Piedmont did not provide any written notice of the Title IX complaint of charges against Dr. Wainberg prior to his interview, nor disclose the identity of the witnesses who made allegations against him, nor provide copies of the documents or information that he could prepare in advance of his interview with the Title IX Investigators. (Mellichamp Dep. 180:20-

181:6; 217:3-8.)

56.     President Mellichamp testified that Dr. Wainberg was never afforded employee rights to present witnesses and other evidence during the investigation process, and that **no Grievance Committee was ever instituted for Dr. Wainberg's Title IX investigation.** (Mellichamp Dep. 293:14-294:9.)

### CHRONOLOGICAL TIMELINE

57.     **On March 21, 2018**, Dr. Wainberg had a heated dispute with college administrator Dean Steven Nimmo over what Dr. Wainberg believed was an issue concerning academic integrity where the university engaged in gender discriminatory treatment surrounding female college athletes. (Rettig Dep. 223-224; Nimmo Dep. 181:1-8; Mellichamp Dep. 248:7-251:8.)

58.     **The same day, March 21, 2018** President Mellichamp emails Dean Nimmo: "Document. I am phoning the college's attorney" and Dr. Wainberg emails the Dean asking when the college is going to stand up for integrity. (Ex. P-12, P-13, Mellichamp and Nimmo Emails; Mellichamp Dep. 248:7-251:8, 252:11-15.)

59.     **The next day, March 22, 2018,** at 7:25 a.m., Professor Monika Schulte sent an email to a dual-enrolled high school student named Cody Weyrich asking him to document why he withdrew from Dr. Wainberg's course, and President Mellichamp admits talking to her about this that day, less than 24 hours after the

dispute with Dr. Wainberg. (Mellichamp Dep. 251:10-18; 254:7-19; Ex. P-14.)

60.    In her email to Weyrich, Professor Schulte says: "since you withdrew from the lab you will not be able to leave a feedback on the course evaluation. Therefore I have to ask you for a favor! Can you please bring your experience on paper for me! ... It doesn't have to be long, and should be addressed to President Dr. Mellichamp. Only then the institution will be able to adjust the problem. We need a paper track." (Ex. P-14.)

61.    Weyrich did not provide a written statement to Professor Schulte and was not interviewed by the Title IX Investigators, however he later signed a sworn affidavit stating that he believed Dr. Wainberg was a good teacher and that his conduct "never created an intimidating, hostile, or offensive educational environment." (Ex. P-15, Weyrich Aff.)

62.    President Mellichamp admits that there is no complaint from any student on record stating that they dropped Dr. Wainberg's class or the biology major due to his making inappropriate comments in class. (Mellichamp Dep. 255:21-25.)

63.    President Mellichamp admits that he and Professor Schulte are personal friends that he socialized with (Mellichamp Dep. 270:19-23) and there is much documentation of them texting back and forth in German negatively about Dr. Wainberg. (Ex. P-25, P-53, P-54, P-66, P-67.)

64.    **March 22, 2018**, Dean Nimmo and President Mellichamp continue to discuss this issue of Dr. Wainberg. (Ex. P-17, Mellichamp and Nimmo Email.)

65.    **On April 13, 2018**, Vice President of Academic Affairs Perry Rettig and President Mellichamp email each other about deciding not to give a pay raise to Dr. Wainberg where Dean Nimmo recommends a 0% increase and President Mellichamp responds that he "absolutely" supports it. (P-18, Rettig and Mellichamp Email; Mellichamp Dep. 254:23-257:11.)

66.    **On April 15, 2018**, an older student named Jessica Smith emails Dean Nimmo about some comments she overheard from a male student (Nimmo's work-study student "R.A.") concerning Dr. Wainberg, which will be the "complaint" used to commence the Title IX investigation against Dr. Wainberg. (Ex. P-19, Smith Complaint Email to Nimmo.)

67.    Defendant identifies Jessica Smith as the Title IX "complainant." (Mellichamp Dep. 165:17-25; 172:13-18; 181:24-182:13.)

68.    The female student complainant, Jessica Smith, had she been accused of a Title IX violation would have had the right to a procedural hearing where she could have presented witnesses, but Piedmont did not allow Dr. Wainberg (a male) to present witnesses nor was he allowed his equitable grievance hearing. (Compare Ex. P-7, Student Handbook Title IX Policy with Ex. P-5 at Wainberg D-1389-1390,

Title IX grievance policy; Sutton Dep. V.1 162-165, 175:20-176:2.)

69.    In 2016, President Mellichamp admitted that he had a previous Title IX matter and that Piedmont's attorney correctly advised him that the Title IX process required him to convene a Grievance Committee. (Ex. P-21; Mellichamp Dep. 222:7-223:9.)

70.    President Mellichamp has testified under oath that he has no doubt, as college president, there is a Title IX process that is due under federal law. (Mellichamp Dep. 221:20-24.)

71.    **On April 16, 2018,** President Mellichamp instructs VPAA Rettig and Dean Nimmo to "document everything," let Dr. Wainberg know "any future complaints…could jeopardize his future employment," and that if Dr. Wainberg comes running to him he can "start the maybe its time to think about retirement conversation with him." (Ex. P-22, Nimmo, Rettig, and Mellichamp Email.)

72.    VPAA Rettig admits that the meeting he and Dean Nimmo had with Dr. Wainberg occurred shortly after Wainberg had a heated dispute with Nimmo concerning what Dr. Wainberg contended to be discriminatory treatment he believed the College was pressuring him to undertake regarding grades, admitted that the complaint email was only discussed for a few minutes, and that Dr. Wainberg was only showed a partially disclosed email:

So shortly after Dr. Wainberg had the heated dispute with Dean
Steven Nimmo about what he contended to be unequal or
discriminatory treatment that he contended the college was pressuring
him to undertake, you and Dean Nimmo had the conversation with
him concerning the allegations brought forth by the complainant,
Jessica Smith; correct?
A Yeah. That Jessica Smith was April what? I'm sorry. I just can't
remember the timeline. This was March 21st.
Q Right.
A Okay.
Q So a few weeks -- is it fair to say, a few weeks later in April that's
when you and Dean Steven Nimmo confronted -- well, discussed for a
few minutes the partially disclosed email that having drafted by the
complainant Jessica Smith; correct?
A That seems to be correct.

(Rettig Dep. 226:21-227:13.)

73.    Prior to this incident, Dr. Wainberg had never been warned or
administered progressive discipline by the administration about any performance
concern throughout his career. (Nimmo Dep. 236:8-18.)

74.    **On April 16 2018**, student "R.A." (who Jessica Smith referred to in her
complaint) is encouraged by Dean Nimmo to write a bad course evaluation for Dr.
Wainberg, types it up on the Dean's office computer where he works ("R.A." Dep.
109-112), and would later show this document to Dean Nimmo who encouraged him
to submit it. ("R.A." Dep. 211-212.)

75.    "R.A." testified that he would have never shown the evaluation to Dean
Nimmo if he had known that it would be used in support of the decision to terminate

Dr. Wainberg and that his intent was never to file a Title IX complaint. ("R.A." Dep. 212-215.)

76.    "R.A." testified that Dr. Wainberg's comments in class never rose to the level of a Title IX violation, never interfered with the learning environment, created a hostile environment, and was not severely prejudicial to the college. ("R.A." Dep. 218-220; P-3, "R.A." Aff.)

77.    "R.A." testified that Dr. Wainberg was a good teacher whose heart was in the right place. ("R.A." Dep. 220.)

78.    "R.A." testified that President Mellichamp sexually harassed him. (P-3, "R.A." Aff.)

79.    **On April 20, 2018,** Jessica Smith told Title IX Coordinator Sutton that her complainant identity can be released to Dr. Wainberg (even though it is never released to him, even at his Termination Appeal Committee Hearing). (P-24, Smith Email.)

80.    According to Title IX Coordinator Sutton, the only students interviewed as witnesses either came from the Complainant or Dean Nimmo. (Sutton Dep. V.2 24:10-25:6.)

81.    **In April 2018**, President Mellichamp presented his intent to terminate Dr. Wainberg to the Executive Committee meeting of the Board of Trustees and that

they informed him to go ahead with the procedure, according to the Board Chairman. (Arrendale Dep. 202.)

82.    **April 18-20, 2018:** President Mellichamp exchanges texts with Professor Schulte regarding trying to get students to testify against Dr. Wainberg. (Ex. P-25.)

83.    **April 23-24, 2018:** President Mellichamp admits that the Title IX investigation began interviewing students. (Mellichamp Dep. 272:3-6.)

84.    **On April 26, 2018**, President Mellichamp told VPAA Rettig that Dr. Wainberg will not be given names of the witnesses, faculty, or students who have been interviewed as a part of the Title IX investigation. (Ex. P-26, Email to Title IX Team; Mellichamp Dep. 272:3-6.)

85.    President Mellichamp admitted he instructed the Title IX Investigators not to inform Dr. Wainberg the name of the Complainant who had made the allegation against him. (Mellichamp Dep. 272:3-6.)

86.    **On April 30, 2018**, Dr. Carlos Camp met with President Mellichamp and confirmed that Mellichamp intended not to offer Dr. Wainberg a contract for the next year. (Ex. P-27; Camp Dep. 45:8-20, 43:14-44:25.)

87.    **On April 30, 2018**, fellow faculty member Dr. Jessica Wooten found out from Dr. Camp that President Mellichamp intended to have Dr. Wainberg

terminated (Wooten Eagle Dep. 43:24-44:15) and testified that his colleagues were devastated and that Dr. Wainberg is a gentleman and does not sexually harass women. ("I just want to say that not only is Rob a gentleman, but he cares a lot about his students and the faculty that he works with. He's -- Q How does he treat male students and female students? A With respect and dignity like we all try to do.") (Wooten Eagle Dep. 45:20-46:1.)

88.    **On May 2, 2018**, Dr. Camp tells Dr. Wainberg that he is going to be terminated despite Dr. Wainberg still being completely unaware of the Title IX investigation going on behind his back. (Ex P-27; Camp Dep. 46-47.)

89.    **On May 2, 2018**, President Mellichamp instructed Title IX Coordinator Sutton and Title IX Investigators Peeples and Allison to conduct interviews of the department chair and faculty after all exams are completed and all grades submitted, even though he would terminate Dr. Wainberg before the investigation could be completed. (P-28, Mellichamp Email Directing Faculty Interviews After Exams.)

90.    President Mellichamp admitted the Title IX investigation against Dr. Wainberg was never completed. (Mellichamp Dep. 177:5-10.)

91.    **On May 2, 2018**, Title IX Coordinator Sutton told Title IX Investigators Peeples and Allison that President Mellichamp does not want faculty members (Dr. Wainberg is a faculty member) to know the names of the students

involved in Title IX investigation. (Ex. P-29, Sutton Email; Sutton Dep. V.2 36:1-5.)

92.    **On May 2, 2018,** College Attorney Pat McKee drafts the Notice of Termination letter from President Mellichamp that will be given to Dr. Wainberg on and ultimately dated May 11th (the meta-data from Word document shows it was written McKee on May 2nd). (Cf. Ex. P-30 with Ex. P-1.)

93.    **May 2, 2018:** Despite a termination letter being drafted this day, President Mellichamp admits that Dr. Wainberg did not know at the time there was a Title IX investigation going on and had not been interviewed by the Title IX Investigators. (Mellichamp Dep. 281:21-282:12.)

94.    **On May 4, 2018**, Dr. Wainberg finds out about the Title IX investigation for the first time from President Mellichamp through a verbal conversation and Mellichamp refuses to give him any documentation/written notice, later telling Dr. Wainberg in an email that Piedmont was not legally obligated to provide him with any documentation. (Ex. P-31, Mellichamp Email; Mellichamp Dep. 286:21-287:6; 288:2-7; 288:9-19.)

95.    Dr. Wainberg never received any written notice from Piedmont letting him know what he was being charged with, what the Title IX complaint said, who was making it, nor was he informed him of the identities of the accuser and witnesses

so he could properly respond, nor was he ever told exactly what law or policy he violated, prior to his termination. (Sutton Dep. V.2 41:17-42:9; Allison Dep. 175:15-176:15; Mellichamp Dep. 180:20-181:6; Ex. P-31.)

96.    **On May 4, 2018**, Title IX Coordinator Sutton drafts a document entitled "Title IX accused statement of rights for employees" and emails the draft to Title IX Investigator/Director of HR Allison, outlining the rights of an accused employee, despite the fact that Dr. Wainberg was being provided none of these rights and being denied any documentation to provide written notice of the summary of his charges per President Mellichamp's May 4th email to him denying him such. (Ex. P-32, Sutton Email; Ex. P-31; Allison Dep. 179:1-25, 183-184.)

97.    **On May 7, 2018 at 10:05 am**, Title IX Coordinator Sutton emails President Mellichamp and Title IX Investigators Allison and Peeples saying since harassment claims follow the (Title IX) grievance policy they need to give the accused (Dr. Wainberg) a copy of the written policies to insure a fair process. (Ex. P-34, Sutton Email re Giving Wainberg Policies.)

98.    **On May 7, 2018 at 5:44 pm**, President Mellichamp responded to Title IX Coordinator Sutton and Title IX Investigators Peeples and Allison saying that Dr. Wainberg should not receive such written documentation, denied Dr. Wainberg names of the students making statements, and told them that Dr. Wainberg was not

to be given copies of the written policies or get any information on the statements made against him prior to the interview. (Ex. P-10, Mellichamp Email; Sutton Dep. V.2 57:15-58:6.)

99.    **On May 7, 2018,** even though Dr. Wainberg has not yet been interviewed by the Title IX Investigators, President Mellichamp selects the three Board Members who will hear Dr. Wainberg's appeal of his termination and one of them, Dock Sisk, agrees to do so while telling the President "I certainly hope with your eloquence you can make him understand the best route for him to take." (Ex. P-36; Arrendale Dep. 229:8-12, 305:4-9, **admitting President Mellichamp selected the Board Members**.)

100.   President Mellichamp agrees that Title IX, under federal law, has always required that the grievance process be done impartially, free of conflicts of interest and bias. (Mellichamp Dep. 131:10-13.)

101.   **On May 8, 2018**, Dean Nimmo and Chair of the Biology Department, Dr. Elaine Bailey were interviewed by Title IX Investigators Allison and Peeples. (Ex. P-37, Interview Synopses of Witnesses.)

102.   **On May 8, 2018**, after President Mellichamp saw what Dr. Bailey said in her interview synopsis as part of the Title IX investigation, he tells Dean Nimmo and VPAA Rettig that he wants to demote her. (Ex. P-38, Mellichamp Email.)

103.   **On May 8, 2018**, President Mellichamp admitted he requested the findings from the Title IX team. (Mellichamp Dep. 314:16-21; Ex. P-39, Mellichamp Email.)

104.   **On May 9, 2018,** during his interview, the Title IX Investigators never presented Dr. Wainberg with the complaint made against him so he could respond to it as admitted by the Title IX Investigator Peeples: "Q Okay. During your interview of Dr. Wainberg, did you show him the e-mail that Jessica Smith had written? A No. Q During your interview with Dr. Wainberg, did you show him any written complaint that had been made against him? A No. Q During your interview with Dr. Wainberg, did you present the complaint that had been made against him so he could formally respond to this specific complaint? A No." (Peeples Dep. 150:7-19.)

105.   **On May 9, 2018,** When Title IX Investigators Allison and Peeples interview Dr. Wainberg they take notes (Ex. P-40, Notes Taken by Title IX Investigators which they allege are Wainberg Interview Synopsis Comments; Ex. P-37, Interview Synopses of Witnesses) but notably, these are never produced or provided to Dr. Wainberg or the Board Members at the Termination Appeal Committee Hearing. (*See* Ex. P-41, Termination Appeal Hearing Evidence Packet.)

106.   **On May 9, 2018**, Dr. Wainberg's Attorney, Doug Henry, writes to

President Mellichamp on his client's behalf regarding the numerous due process violations that occurred at his Title IX investigation interview including prohibiting him from viewing the evidence and charges against him beforehand and denying him sufficient time to prepare. (Ex. P-42, Henry Letter.)

107.   **On May 10, 2018:** President Mellichamp forwards an email from College Attorney Pat McKee, about Dr. Wainberg's attorney claiming due process violations, and writes "Read it and laugh" to Wallace Hinson, a music professor whom President Mellichamp admits had no involvement Dr. Wainberg's personnel matter. (Ex. P-43; Mellichamp Dep. 319:1-321:20.)

108.   **On May 10, 2018 at 4:05 pm**, President Mellichamp admits he sought a recommendation from the Title IX Investigators concerning Dr. Wainberg (Mellichamp Dep. 315:13-17) and emailed Title IX Coordinator Sutton and Title IX Investigators Allison and Peeples stating "I need a recommendation from you all-if possible prior to my 8.30 am meeting tomorrow with Dr. Wainberg. The interview process can follow later." (Ex. P-44, Mellichamp Email.)

109.   **On May 11, 2018,** President Mellichamp met with Dr. Wainberg to notify him he was being terminated for violating Title IX, despite not having received any recommendation from the Title IX Investigators and despite Piedmont failing to follow the Title IX policy by failing to hold a Grievance Committee

hearing or provide Wainberg with written notice or any other equitable grievance procedure as required by the Title IX policy. (Ex. P-1; Sutton Dep. V.2 79:10-17, 41:17-22; Allison Dep. 175 15-176:15.)

110.   President Mellichamp admitted under oath that the college must investigate allegations of sexual harassment in any formal complaint and send written notice to the complainant and respondent of the allegations upon receipt of a formal complaint, and that under federal law, Title IX has always required colleges to investigate allegations of sexual harassment. (Mellichamp Dep. 132:1-15.)

111.   **May 11, 2018:** President Mellichamp admits that the very first written notice Dr. Wainberg received informing him that there were Title IX allegations made was on May 11th through the letter that informed him that he was being terminated and that he has made comments that "constitute sexual harassment in violation of Title IX." (Mellichamp Dep. 201:25-202:13; 282:18-283:6; Ex. P-1.)

112.   **May 11, 2018:** President Mellichamp told Dr. Wainberg that Piedmont did not need to follow Due Process, informed Dr. Wainberg that he would receive the notes of his May 9th interview (which he never did), told Dr. Wainberg he would be barred from campus, and gave Dr. Wainberg the Notice of Termination letter. (Ex. P-45, May 11 Meeting Minutes; Ex. P-1, Notice of Termination Letter; Ex. P-

46, Audio Recording of the May 11[1] Meeting[1], a true and accurate copy as identified by President Mellichamp, Mellichamp Dep. 201:7-14.)

113.    President Mellichamp testified under oath that this (Wainberg-D-00000431-432) was the 2017-2018 employment contract for Dr. Wainberg that he signed on May 1, 2017, which incorporated the Piedmont University policies and procedures. (Mellichamp Dep. 339:7-11; Ex. P-47.)

114.    Dr. Wainberg was not an at-will employee but had a contract for tenure as admitted by Defendant's Expert, Dr. Lawrence M. Schall:

> Q And you agree with me that Dr. Wainberg was not an at-will employee? He was an employee who had a contract for tenure, agreed?
> A Agreed.

(Schall Dep. 159:15-18.)

115.    Dr. Wainberg had a contract for the 2017-2018 year (*see* Ex. P-47) and he could not be terminated without cause as admitted by Defendant's Expert Schall:

> Q Because Wainberg had a contract the 17-18 year, he could not be terminated without cause, agreed, yes, or no?
> A I agree.

(Schall Dep. 166:17-20.)

116.    In addition to Dr. Wainberg's contract for the 2017-2018 year, he also

---

[1]https://www.dropbox.com/s/lo0d0h71rtnf0nz/P046%20May%2011%20Meeting%20%28Wainberg%20001108%29.mp4?dl=0

had a contract for tenure with the university as admitted by Defendant's Expert

Schall:

> Q And because -- and you agree that Wainberg didn't just have a
> contract for that given year, but Wainberg had a contract for tenure
> meaning there was an expectation of continuous employment where
> his contract would be renewed at the end of each year, correct, yes, or
> no?
> A There were expectations that goes both ways, correct.

(Schall Dep. 166:21-167:3.)

117.   Because Dr. Wainberg had a contract for tenure, he also could not be

terminated or non-renewed except for cause as admitted by Defendant's Expert

Schall:

> Q Yes. And because he had a contract for tenure, he could not be
> terminated except for cause, agreed, yes, or no?
> A Agreed.

(Schall Dep. 167:4-7.)

118.   Because Dr. Wainberg had a contract for tenure, he could not be

terminated without the right to appeal the decision if he chose with a fair, impartial,

and timely hearing as admitted by Defendant's Expert Schall:

> Q And because he had a contract for tenure, he could not be
> terminated without being afforded, if he chose, a fair and impartial
> hearing, correct, yes, or no?
> A He could not be terminated without the rights that were given to
> him in the handbook.
> Q Yes, and I hope that you know those rights because you're opining
> as their expert and their policy afforded tenured employees, such as

31

Dr. Wainberg, a fair and impartial hearing, correct?

A And timely, I believe.

Q Yes, timely. Thank you. So the requirement was that, it was twofold, wasn't it?

A contracted tenure employee, such as Dr. Wainberg, could not be terminated unless number 1, there was cause, correct?

A Correct.

Q And number 2, he was afforded a timely, fair, and impartial hearing, correct, yes, or no?

A Correct. Yes.

Q Thank you. You agree that those policies and procedures of the faculty handbook were incorporated into his contract in your words, a mutual obligation between both the college as well as Dr. Wainberg, agreed, yes, or no?

A Agreed.

Q Thank you.

(Schall Dep. 166:17-168:8; see also Mellichamp Dep. 159:1-161:8; Ex. P-5 at

Wainberg-D-1434-1436, Tenure Policy 4.13; P-5 at Wainberg-D-1437-1438

Tenure Termination Policy 4.16.)

119.  Title IX policy was incorporated into the contract because both

President Mellichamp and Defendant's Expert Schall admitted that policies and

procedures of the faculty handbook were incorporated into Dr. Wainberg's contract.

(Mellichamp Dep. 339:7-11; Schall Dep. 166:17-168:8.)

120.  **May 15, 2018**, Chair of the Biology Department Dr. Elaine Bailey

talked to VPAA Rettig about being retaliated against/demoted as a result of her

participation in a Title IX investigation interview concerning Dr. Wainberg. (Bailey

Dep. 80:25-83:7.)

121.  **On May 15, 2018**, Dr. Bailey confronted Title IX Investigator/Director of HR Allison about having the written statement Allison had typed up entitled 'interview synopsis' which appeared to be a transcript. Dr. Bailey challenges this synopsis of what she said during the investigation in her redlined rebuttal as a "complete misrepresentation." (Ex. P-48, Elaine Bailey Email and Redlined Rebuttal; Ex. P-49, Allison Response to Bailey Email.)

122.  President Mellichamp admitted that after reading her transcript he decided to demote Dr. Bailey (Mellichamp, 313:17-314:11) and told VPAA Rettig and Dean Nimmo that he was demoting Elaine Bailey. (Ex. P-50, Mellichamp and Nimmo Email re Bailey Demotion.)

123.  **On May 15, 2018,** Title IX Coordinator Sutton told Title IX Investigator Peeples via email that President Mellichamp had the Dr. Bailey synopsis put in the packet for Dr. Wainberg's file, but the reality is Dr. Wainberg never got this exculpatory evidence—Dr. Bailey's redlined rebuttal explaining that her synopsis was a "complete misrepresentation"—provided in his file submitted to the Board Members for his Termination Appeal Committee Hearing.(Ex. P-51, Sutton Email; Ex P-48, Bailey Email and Redlined Rebuttal; Wainberg Dep. V.3 428:2-8.)

124.  **May 17, 2022,** President Mellichamp emails a friend who lives in

Michigan named Ken Melichar false statements about Dr. Wainberg, writing: "A group of students came forward in March and filed a Title IX complaint against Wainberg. Three weeks of investigations and I terminated him a week ago. Hostile learning environment by introducing sex into every class. So there you go. He had the option to appeal to the board, and no severance, or walk away with $30K. He's walking." (Ex. P-52; Mellichamp Dep. 322:1-25.)

125.   Notably, President Mellichamp's email to Melichar contained false statements ("group of students came forward in March and filed a Title IX complaint against Wainberg," and "he's walking" [accepting $30k in severance rather than appealing].) (Mellichamp Dep. 213-215.)

126.   President Mellichamp admitted: "you're only authorized to talk about confidential personnel matters, involving a termination of an employee, to those people who actually have a legitimate need to know, meaning it's part of their work duties at Piedmont College, yes or no? A Yes." (Mellichamp Dep. 211:23-230:2.)

127.   **May 18-25, 2018:** Continued text messages occur between President Mellichamp and Professor Schulte. (Ex. P-53.)

128.   **May 21-23, 2018**: President Mellichamp and Professor Schulte correspond via email. (Ex. P-54; Mellichamp Dep. 329-333.)

a.   May 21: President Mellichamp asks her to "write something. We

urgently need something that makes it clear that there are students who have given up biology as a discipline due to his behavior. You told me about a joint-enrolled student." (P-54 at Wainberg-D-4295-4296.)

b.  May 21: Professor Schulte sends President Mellichamp a draft of her letter to which he responds "Perfect, don't change one thing!" (P-54 at Wainberg-D-4284.)

c.  May 23: Professor Schulte expresses concern about her letter, and is fearful of being sued. She is assured by President Mellichamp that she will be protected and that "if Wainberg or his colleagues should attempt to retaliate in any way, they will be subject to termination or further sanctions." (P-54 at Wainberg-D-42891.

d.  May 23-24: President Mellichamp explains the process to Professor Schulte in more detail, and states that with reference to the three local trustees who will hear the appeal, "there is no way they will override my decision…two committee members…will tell him go fly a kite" and tells Professor Schulte that Wainberg "has made such ridiculous statements, like, I am tenured, so it does not matter what you write in your course evaluations. No one will listen to you." (P-54 at Wainberg-D-4293-4294.)

**e.** May 23: Professor Schulte refers to Wainberg as a "deadbeat." (Mellichamp Dep. 329:19-24; P-54 at Wainberg-D-4291.)

**f.** May 24: President Mellichamp says "If Wainberg or any of his colleagues seeks revenge, it will be very bad for them." (P-54 at Wainberg-D-4293.)

129. **On May 21, 2018**, Professor Schulte sends her letter about Dr. Wainberg to President Mellichamp to be used at Wainberg's Termination Appeal Committee Hearing. (Ex. P-55, Schulte Letter.)

130. There is much documentation of Professor Schulte and President Mellichamp texting back and forth in German negatively about Dr. Wainberg. (Ex. Ex. P-25, P-53, P-54, P-66, P-67.)

131. President Mellichamp admits Professor Schulte was a personal friend that he socialized with. (Mellichamp Dep. 270:19-23.)

132. Professor Schulte claims students have dropped out of Wainberg's class due to his behavior, but these students deny such an allegation. (Ex. P-55; *see* P-15 Weyrich Aff.; P-56, "M.M." Aff.; P-57 Oliver Aff.)

133. While Professor Schulte's letter claims that students withdrew from Dr. Wainberg's classes because of comments he had said in class, President Mellichamp admitted that there was no record of students stating that they had dropped

Wainberg's class or dropped a biology major because of things Wainberg had said. (P-55; Mellichamp Dep. 214:19-216:1.)

134.    **May 22, 2018:** VPAA Rettig emails Dean Nimmo and says "I need proof that you discussed this with him!" (Ex. P-58) Nimmo then created the document that he dates January 8, 2015, even though it is drafted in May of 2018, that said "I met with Rob on January 8, 2015 and discussed…inappropriate comments of a sexual nature in his biology… class." (Ex P-59, Nimmo Scan to Rettig and Mellichamp's secretary, Phillis Howell; Ex. P-60, Retting and Nimmo Emails.)

135.    Dean Nimmo later admitted that this Word document that is backdated January 2, 2015 was actually just typed up around that same time in May of 2018. (Ex. P-59; Nimmo Dep. 174:4-175:6.)

136.    **May 23, 2018:** President Mellichamp tells Termination Appeal Committee Board Members Sisk and Cantrell that Dr. Wainberg might try to get a lesser sanction and they can't do that its either termination or no, contradicting the advice Compliance Coordinator Judy Spain from the Georgia Independent Colleges Association gave Sutton regarding lesser recommended sanctions and progressive discipline. (Ex. P-61; Sutton Dep. V.2 94:18-100:25.)

137.    **May 24, 2018:** Dr. Wainberg was denied any written documentation or

file of evidence until 12 noon the day before his Termination Appeal Committee Hearing on May 24th with less than 24 hours to prepare before the Hearing and the file was missing much evidence including the synopsis and notes of his own interview and the "complete misrepresentation" Dr. Bailey's redlined interview with the Title IX Investigators. (Ex. P-41, Termination Appeal Hearing Evidence Packet; Rettig Dep. 115:9-16; 116:16-23, 118:13-22, 130:1-25, 131:18-132:6.)

138.    Furthermore, the Board Members are told by VPAA Rettig in his presentation by the university that "the basis for this termination decision is for violation of the Piedmont college policy 3.16A on Sexual Harassment which addresses Federal law with regard to Title IX." (Ex. P-62 at Wainberg-D-557; Rettig Dep. 143:20-144:3.)

139.    Notably, the policy provided the Board Members and Dr. Wainberg within the evidence file presented at the Termination Appeal Committee Hearing is incomplete, it is only one page of the policy and **notably leaves out the part that outlines the Grievance Committee hearing and appeal process**. (Ex. P-41, Termination Appeal Hearing Evidence Packet at Wainberg-D-519.)

140.    Moreover, VPAA Rettig tells the Board that "Dr. Wainberg has successfully been trained in Title IX issues and yet he admits to a history of harassing discussion in his classes and he flaunts his tenure censuring student complaints."

(Ex. P-62 at Wainberg-D-563.)

141. **On May 25, 2018**, at his Termination Appeal Committee Hearing Dr. Wainberg was not allowed to present any other witnesses; allowed the opportunity to cross-examine any other witness and was never allowed the opportunity to cross-examine or challenge his accusers. (Mellichamp Dep. 209:3-15.)

142. **May 27, 2018**: VPAA Rettig sends an email to President Mellichamp's husband, Daniel Smith, filling him in on how his presentation of the evidence "overwhelmed them.." and that Dr. Wainberg "just stammered around then for 30 minutes." Rettig later apologized in his deposition for sharing a personnel matter with the spouse of the President. (Ex. P-63; Rettig 279:15-280:14.)

143. **May 28, 2018**: Board Members discuss lack of notice given to Dr. Wainberg and say they're going to talk to President Mellichamp about it. (Ex. P-64.)

144. **May 28, 2018:** Gus Arrendale, Chairman of the Board of Trustees, sends letter to Dr. Wainberg regarding the Termination Appeal Committee's decision to uphold the termination. (Ex. P-65.)

145. **June-August 2018:** President Mellichamp and Professor Schulte continuing to text message gossip about Dr. Wainberg, including Schulte calling him "nothing but a grouchy, miserable, poor old has-been." (Ex. P-66, P-67.)

146. In fact, President Mellichamp admits that, in April through August

2018, he exchanged text messages and emails with Professor Schulte about Dr. Wainberg, many written back and forth in German and admits some of them were derogatory. (Mellichamp Dep. 324:21-325:13.)

147.    On May 28, 2018, Dr. Wainberg received a letter from Chairman of the Board of Trustees, Gus Arrendale, informing him of the unanimous vote to terminate him. (Ex. P-65.)

## ADVERSE WITNESS VICE PRESIDENT OF ACADEMIC AFFAIRS PERRY RETTIG

148.    VPAA Rettig testified that academic freedom is a principal accepted through academia through colleges and universities and a policy that Piedmont instituted (Rettig Dep. 20:5-13) which affords professors the freedom in a college setting to discuss sex in the classroom related to the subject matter that they are teaching albeit science or literature. (Rettig Dep. 54:13-17.)

149.    VPAA Rettig testified that the topic of sex in the classroom is different than committing an act of sexual misconduct, and that college professors have the academic freedom to refer to the topic of sex in the classroom as it relates to the subject matter they are teaching. (Rettig Dep. 56:18-21, 57:8-21.)

150.    VPAA Rettig agreed that students in college classrooms are considered young adults and that young people in college classroom setting have minds that should be introduced to new ideas even if those ideas might be sexually offensive to

some. (Rettig Dep. 59:20-22, 61:7-24, 26:13-18.)

151.   VPAA Rettig agreed that for example, it could be appropriate to teach literature that could have some type of erotic content or profanity within a college classroom. (Rettig Dep. 24:9-15, 35:8-36: 2.)

152.   Piedmont's policy purportedly "safeguards and protects these rights of academic freedom by providing faculty and students their right to initiate grievance procedures should they have complaints dealing with the infringement." (Ex. P-5 at Wainberg-D-1438-1439, Academic Freedom Policy; Rettig Dep. 33:15-21.)

153.   VPAA Rettig admits that as a general rule tenured professors as it relates to academic freedom should not be terminated by their college or university, because to terminate tenured professors can harm the academic freedom in a college setting, and because it is important because it is important for tenured professors to be protected from termination in order to preserve the right to academic freedom. (Rettig Dep. 74:4-75:7.)

154.   VPAA Rettig believes that it would be damaging to be found in violation of Title IX as a college professor because potentially someone may not want to hire them. (Rettig Dep. 48:9-14.)

155.   VPAA Rettig states that a hearing should be impartial and fair and agrees that a fair hearing demands that a tenured faculty should be entitled to obtain

all the evidence to be used against him, including obtaining exculpatory as well as inculpatory evidence. (Rettig Dep. 77:21-78:5, 78:23-79:13, 81:5-14, 81:16-82:8.)

156.    VPAA Rettig admits that it is important for tenured faculty member to receive written notice of the charges made against him in order for him to receive a fair hearing. (Rettig Dep. 100:13-17.)

157.    VPAA Rettig admits that the evidence provided to Dr. Wainberg as part of the documentation for his Termination Appeal Committee Hearing did not include the exculpatory evidence of Dr. Elaine Bailey, Chair of the Biology faculty, where she wrote that her Title IX interview synopsis was a complete misrepresentation. (Rettig Dep. 142:6-143:19.)

158.    VPAA Rettig admits that Dr. Bailey's objections to the misrepresentation were completely absent to the file submitted to the Board, and that the name of the complainant was also missing. (Rettig Dep. 172:8-25, 143:1-19.)

159.    VPAA Rettig admits talking to Dean Nimmo about the heated dispute Nimmo had with Dr. Wainberg regarding Wainberg's concerns that students shouldn't be treated discriminatorily. (Rettig Dep. 223:5-15; 224:1-9, 226:7-12.)

160.    VPAA Rettig and President Mellichamp admit that Piedmont has to comply with Title IX in order to receive federal funding. (Rettig Dep. 157:19-158:5; Mellichamp Dep. 110:18-111:22.)

161.   VPAA Rettig admits that it is wrong for a college to terminate a tenured professor of 30 years, without complying with Title IX policies. (Rettig Dep. 160:11-18.)

162.   VPAA Rettig admits that there was never a Grievance Committee appointed to hear the grievance, and there was no written notice provided to the grievant or respondent mentioning the decision of the Title IX Grievance Committee, because no Grievance Committee existed, and no Grievance Committee hearing was held. (Ex. P-5 at Wainberg D-1389-1390, Title IX grievance policy; Rettig Dep. 123:14-18, 124:1-19.)

163.   VPAA Rettig admits that Dr. Wainberg was not permitted to present witnesses at his Termination Appeal Committee Hearing where he was charged with violating Title IX policy concerning sexual harassment and was never afforded the opportunity to cross examine the Complainant Jessica Smith who brought the Title IX complaint, and the Termination Appeal Committee did not even identify the name of the complainant in any documents disclosed **to** Dr. Wainberg**.** (Rettig Dep. 178:24-179:18.)

164.   In the entire file of evidence in support of the termination of Dr. Wainberg, there was no written notice that informed Dr. Wainberg that Title IX allegations were made against him, prior to the notice of the decision to terminate

him by President Mellichamp. (Rettig Dep. 179:19-180:2, 182:19-25.)

165.    VPAA Rettig identified the packet of evidence presented to the Board Members at the Termination Appeal Committee Hearing as Wainberg-D-507-552. (Rettig Dep. 166:11-18; Ex. P-41, Termination Appeal Hearing Evidence Packet.)

166.    VPAA Rettig admits that the Title IX policy that required a Grievance Committee was not followed. (Rettig Dep. 143:24-144:25.)

167.    VPAA Rettig admits that Dr. Wainberg did not obtain a copy of the evidence to be used against him in his Termination Appeal Committee Hearing until less than 24 hours prior to the Hearing commencement, at approximately noon on May 24, 2018 (the hearing was held May 25th). (Ex. P-41, Termination Appeal Hearing Evidence Packet.)

> Q Okay. So you stated to the Board that Dr. Wainberg had received the document packet the previous day -- the previous morning. Why do you believe that to be true? Who told you that?
> A I believe that was Jessica Irving. She was my administrative assistant. I believe I left this packet with her for her to give to him when he came in.

> (Rettig Dep. 115:9-16.)

> Q Would you agree that Dr. Wainberg did not get to review a copy of that evidence file that you used against him in the termination appeal hearing until May 24th?
> A Yes.
> Q That was one day before the hearing?
> A Right. It was probably just prior to the noon hour.

(Rettig Dep. 116:16-23.)

Q Okay. Would you agree with me that Dr. Wainberg did not obtain the file from your office until around noon on May 24th, 2018?
A Yes.
Q Okay. Would you agree that Dr. Robert Wainberg did not obtain a copy of the evidence to be used against him in his termination appeal hearing until less than 24 hours prior to the hearing commencement?
A Yes.

(Rettig Dep. 118:13-22.)

Q Why would a tenured professor who's entitled to the rights of academic freedom not be able to get any of the evidence to be used against him until after the University made a decision to terminate him and less than 24 hours prior to his appeal hearing before the Board?
MS. MARSCHALK: Object to the form.
A I don't know. All I can say is we were still putting our files together.
BY MS. OINONEN:
Q Whose fault is that? Who was in charge of this?
MS. MARSCHALK: Objects to form.
BY MS. OINONEN:
Q Isn't it true it was President Mellichamp?
MS. MARSCHALK: Objection to form.
A President Mellichamp and counsel, Pat McGee.

(Rettig Dep. 130:2-18.)

Whose decision was it to withhold the entire file of evidence to be used in support of terminating a tenured professor of 30 years until after the decision to terminate him and less than 24 hours prior to his appeal hearing before the board?
A I don't know.
BY MS. OINONEN:
Q Was it your decision?
A No, ma'am.
Q The bucks stops with who?

A The President was the decider.

(Rettig Dep. 131:18-132:6.)

168.  To reiterate, this was the first time Dr. Wainberg ever received these documents concerning contentions made against him, including but not limited to statements written by "M.S."and Dean Nimmo. (Rettig Dep. 203:17-204:1.)

169.  VPAA Rettig admits that he didn't know that the interview synopsis weren't actual transcriptions, and admits that they appeared to be actual transcripts, transcribing the interview, and stated at his deposition that it was the first time it was called to his attention that these were not actual transcription of the interviews as they appeared to be. (Rettig Dep. 170:13-16, 171:1-5, 172:1-5.)

170.  VPAA Rettig admits that he never heard Wainberg admit to a history of sexually harassing students. (Rettig Dep. 153:12-25.)

171.  Despite the fact that VPAA Rettig said in his statement to Board Members about Dr. Wainberg at the Termination Appeal Committee Hearing that "**Wainberg violated Title IX policy concerning sexual harassment** and that we must stop this immediately and that he admits to a number of harassing discussions in class", he denies he believed these statements, which were scripted by counsel. (Ex. P-62; Rettig Dep. 210:8-17, 115:9-16, 116:16-23, 118:13-22, 130:1-25, 131:18-132:6.)

172.    VPAA Rettig admits that he told the Board that Dr. Wainberg admitted to a history of harassing discussions and flaunts his tenure sintering student complaints, but admits he never heard Dr. Wainberg do this. (Rettig Dep. 151:7-23, 190:22-191:1.)

173.    Four days prior to Dr. Wainberg's Termination Appeal Committee Hearing VPAA Rettig admits that the college was still collecting evidence to be used against the tenured professor such as the letter of Professor Schulte (Ex. P-55) and evidence that they were not going to give to Dr. Wainberg less than 24 hours prior to the Hearing and without ever giving Dr. Wainberg the opportunity to respond to it prior to his termination notice. (*See* Ex. P-1, Notice of Termination Letter; Rettig Dep. 256:9-257:19, 265:1-25):

> Q …referring to the packet -- the file of evidence to be used against Dr. Wainberg in support of his termination before the Board appeal hearing; correct?
> A Correct.
> Q Okay. So this is a letter that you just gotten May 21st long after Dr. Wainberg was notified that he was being terminated; correct?
> A Yes.
> Q The college is still collecting evidence to be used against the tenured professor that they are not providing the tenured professor; correct?
> A Correct.
> Q They are not providing -- would you agree they are not providing these -- this evidence to the tenured professor to allow him to refute and rebut the allegations that are being made against him; correct?
> MS. MARSCHALK: Object to form.
> A Correct. He did not receive this until the 24th.

(Rettig Dep. 257:1-19.)

…but I do believe they have protection.
Q Okay. All right. So I think this went to
my question as to why as an administrator, a university administrator,
someone who has worked in the field of education for 34 years, even
though you were appointed by the college President at the time to be
the representative that would oversee the termination hearing of Dr.
Wainberg, why you would take a piece of evidence and use it
believing the word of a female faculty member who made a statement
– a very serious allegation without affording the opportunity for a
male faculty member to respond to the allegations made against him.
Why did you decide to do that?
MS. MARSCHALK: Objection to fifth time you've asked the
question.
A I serve at the pleasure of the President, so.
Q You serve at the pleasure of the President; correct?
A I do.
Q I agree with that. I understand because you're not a tenured -- as a
Vice President of Academic Affairs, you weren't tenured; correct?
A Right. I had tenure in Wisconsin

(Rettig Dep. 265:1-25.)

174.   VPAA Rettig admits that the glaring omission in the file of evidence

presented before the Board was there were no names even identifying the

complainant and Dr. Wainberg couldn't present witnesses because he didn't find out

what the allegations were against him or what he was even being charged with until

less than 24 hours prior to his Termination Appeal Committee Hearing:

Q But would you agree with me that there's one glaring omission in
your file. Would you agree with me there is no name identifying who
the name of the complaint is in the document that you presented to the

Board; correct?
A I believe that's correct.
Q Okay. And Ms. Marschalk made such a big deal about Dr.
Wainberg didn't present any witnesses but isn't it true that Dr.
Wainberg didn't even receive the documentation of what evidence and
what allegations were being used against him or what he was being
charged with until less than 24 hours before that hearing; correct?
MS. MARSCHALK: Objection to form.
A Correct.

(Rettig Dep. 322:5-19.)

175.   VPAA Rettig testified that in the Termination Appeal Committee

Hearing there were only four negative evaluations that ever addressed any type of

inappropriate language out of a approximately 4800 over a 30 year time period.

(Rettig Dep. 233:2-234:6.)

176.   When VPAA Rettig is challenged why he had to convict a man in his

Termination Appeal Committee Hearing for violating Title IX and didn't even have

the documents from Dr. Wainberg's Title IX investigation interview, he stated it was

just President Mellichamp's decision even though the documents (Dr. Wainberg's

interview and responses to the Title IX interviews) were missing from the file:

Q So why didn't you stand up to James and say you can't expect me to
try to convict this man of violating Title IX based on a file of evidence
that I don't even have the vary notes of his interview by the Title IX
investigators.

(Rettig Dep. 320:21-25.)

Q Okay. So you -- but you know -- you would agree with me, you

49

knew that there was an interview taken by the Title IX investigators of
Dr. Wainberg. You earlier testified you knew that that happened on or
around May 19th; correct?
A Yes.
Q All right. So those documents were missing from the file and Dr.
Wainberg never received them; correct?
A Not from me.

(Rettig Dep. 321:15-24.)

177.   VPAA Rettig admits that President Mellichamp had the intent to build

a case against Dr. Wainberg. (Rettig Dep. 253:11-24.)

178.   VPAA Rettig apologizes for having poor judgment in responding to

President Mellichamp's husband email. (Rettig Dep. 250:9-24.)

## ADVERSE WITNESS DOCK SISK (BOARD MEMBER THAT SAT ON THE TERMINATION APPEAL COMMITTEE HEARING ON MAY 25TH)

179.   President Mellichamp has conversations with the Board Member Dock

Sisk who sat on the Termination Appeal Committee that, according to the tenure

termination policy, is supposed to be "fair and impartial." (*See* Ex. P-36, Dock Sisk

writes President Mellichamp: "I certainly hope with your eloquence you can make

him understand the best route for him to take.")

180.   Sisk admits: "Q Dr. Wainberg didn't have opportunity to challenge

Steve Nimmo for backdating this document that Nimmo later admitted to under oath

that he had typed up on May of 2018, correct? A Correct. Q Okay. And Dr. Wainberg

certainly didn't have time or prepare to craft a defense for you guys less than -- more

than 24 hours since Mr. McKee did not produce this packet of evidence until 12 Noon the day before, correct? A Correct." (Sisk Dep. V.1 243:2-12.)

## ADVERSE WITNESS BOARD CHAIRMAN GUS ARRENDALE IN HIS DEPOSITION

181.    Board Chairman Arrendale admitted that President Mellichamp picked out the three Board Members that would hear Dr. Wainberg's appeal of his decision to terminate and ran it by him. (Arrendale Dep. 229:8-12.)

182.    Board Chairman Arrendale admits that President Mellichamp typed up his May 28th letter informing Wainberg that the Board Termination Appeal Committee had affirmed the termination decision. "Q. Would you agree with me that you didn't type up this letter, that James Mellichamp typed it up for you? A. Yes, ma'am, that is correct." (Arrendale Dep. 228:16-19.)

183.    Board Chairman Arrendale admitted one of the reasons they terminated Dr. Wainberg was fear of litigation. (Arrendale Dep. 181:11-15, 181:18-23.)

184.    Board Chairman Arrendale admitted that President Mellichamp discussed the evidence regarding his plan to terminate Dr. Wainberg with the Executive Committee of the Board on April 25, 2018, well before Title IX investigation concluded or before Wainberg even was interviewed by investigators or had any written notice, and the Board decided to go ahead with the procedure. (Arrendale Dep. 194:15-196:7, 205:24-206:23.)

185.   Notably, one of the persons on this Executive Committee listening to the one-sided evidence presented by President Mellichamp was Dock Sisk (Sisk Dep. V.1 58:19-20) who would be selected to sit on the Termination Appeal Committee that was supposed to be impartial and fair:

> Q. But at this executive committee, you all decided that Dr. Wainberg was going to be terminated, correct?
> A. We decided that procedure should be -- I guess that's the right word. That the procedure should be started, yes. I'll say that the procedure should be started to end his inappropriate behavior, I guess.
> Q. Okay. And at this executive committee meeting, president James Mellichamp, presented to the executive committee members the evidence that he believed supported the decision to terminate Robert Wainberg, correct?
> A. Yes, on -- Yes, okay.
> Q. Okay. And you all at the meeting discussed the decision to terminate Robert Wainberg, correct?
> A. Correct.
> Q. And you all decided that the procedure should be followed, correct?
> A. That is correct.
> Q. And the procedures set forth in policies, correct?
> A. That's correct.
> Q. And policies need to be followed because they were voted upon by the board of trustees, correct?
> A. Correct.
> Q. They're adopted by the board of trustees, correct?
> A. Correct.
> Q. And the president of Piedmont College can't thumb his nose at the Piedmont College board of trustees policy and decide that he doesn't want to follow them, can he?
> A. He should not.
> Q. Because he has to answer to you all, as the board, correct?
> A. That's correct.
> Q. You all as the board, strike that. James Mellichamp, as college

president, is accountable to complying with the Piedmont College
policies set forth and adopted by the board of trustees, correct?
A. Correct.

(Arrendale Dep. 194:15-196:7.)

## TERMINATION APPEAL COMMITTEE BOARD MEMBER MARTHA CANTRELL

186.   The email exchanged between the Termination Appeal Committee

Board Members Sandy Borrow, Martha Cantrell and Dock Sisk talked about the lack

of warnings given Dr. Wainberg concerning his dismissal and how this should

change in the future. (Ex. P-36.)

## ADVERSE WITNESS PROFESSOR MONIKA SCHULTE WHO WROTE THE LETTER AND STATED STUDENTS COMPLAINED TO HER IN MARCH INCLUDING HER DAUGHTER WHO WITHDREW OUT OF WAINBERG'S CLASS WITH FAILING GRADE

187.   Professor Monika Schulte who wrote the letter against Dr. Wainberg

states that in mid-March of 2018 she made a complaint against Dr. Wainberg to the

college administration based on complaints students were making about sexual

comments Wainberg was making in class:

Q All right. At no point in time did you ever decide that you needed to
file a complaint under Title IX against Dr. Robert Wainberg Piedmont
College, correct?
A I did in that very complaint with Steve Nimmo in March.
Q You said to Dean Steven Nimmo, I'm going to file a Title IX
complaint against Dr. Robert Wainberg?
A I -- I'm not aware that I have to say Title IX.
Q Okay. You said to Dean Steven Nimmo, I would like to make a

complaint against Dr. Robert Wainberg for sexual harassment, correct?
A Uh-huh.
Q Okay. In March of 2018-
A Uh-huh.
Q -- you made a complaint-
A Uh-huh.
 Q -- with the Piedmont College administration-
A Uh-huh.
Q -- concerning Dr. Robert Wainberg in which you alleged that he was committing sexual harassment in violation of Title IX, correct?
A That's correct.
Q Okay. And to whom did you -- to whom did you make the formal complaint to? All three people-
A Uh-huh.
Q -- or just one of them?
A To Dr. Nimmo, to James Mellichamp. It was not as formal to Dr. Almagno. Q Okay."

(Schulte Dep. 127:20-129:1.)

188.   Professor Schulte says Jonah Preston and Harry Oliver complained about sexual comments in Dr. Wainberg's class despite Preston and Oliver's denials. (Schulte Dep. 145:4-146:2; *see* Ex. P-20, Preston Decl., Ex. P-57, Oliver Aff.)

189.   Professor Schulte claims Cody Weyrich made a complaint of sexual harassment and this is why he withdrew from Dr. Wainberg's class, despite Weyrich's sworn affidavit denying such. (Schulte Dep. 152:7-156:16, 158:22-159:25, 160:14-20, 161:9-163:2; *see* Ex. P-15, Weyrich Aff.)

190.   Professor Schulte admitted texting to President Mellichamp back and forth primarily in German about Dr. Wainberg and also in English stating: "I'm sorry

you have to deal with people like that. He is not worth the time you have to spend thinking about his case and he is only using the media in an attempt to extort money out of PC. He is nothing but a grouchy, miserable, poor, old has-been. I hope to never turn into something like him and in the papers, it should say retired and not unemployed, had a nice evening." (Schulte Dep. 246:4-15.)

### EXPERT REPORTS

191.  President Mellichamp testified to receiving consistent revenue from rental properties the college owns that they pay property tax on. (Mellichamp Dep. 233:21-235:15; Ex. P-68.)

192.  Defendant has insurance policies of one million dollars and ten million dollars for the D& O, and Defendant is currently in a dispute with their insurance carrier who has issued a reservation of rights. (Ex. P-70, Policy; Ex. P-23, Coverage Letter.)

193.  In his expert report, Georgia State University Associate Dean for Academic Affairs and Associate Professor of Law, Cassady Brewer, former partner and practice leader in the Tax Group of Morris, Manning & Martin, LLP; who specializes in the legal and tax aspects of the intersection of tax-exempt, nonprofit organizations, opines that charitable immunity does not apply as a defense. (Ex. P-69, Brewer Report.)

194.   In the Title IX expert report by Brett Sokolow, J.D., he opines that in terminating Dr. Wainberg, Defendant failed to uphold industry customs and standards as they relate to the provision of equitable Title IX grievance procedures and its prohibitions on sex discrimination and retaliation. (Ex. P-80, Sokolow Report.)

195.   In the Title IX expert report by Courtney Bullard, J.D., she opines that Defendant failed to comply with industry standards, OCR guidance, the basic principles of due process and fundamental fairness, and its own policies procedures in its Title IX Investigation and adjudication of Dr. Wainberg. (Ex. P-79, Bullard Report.)

196.   Matthew Finkin, Professor of Law and leading authority academic on tenure opined that Defendant did not afford Plaintiff a fair and impartial hearing regarding Plaintiff's appeal of his termination. (Ex. P-35, Finkin Report.)

197.   Robert Kreiser, with 52 years of professional experience in American higher education and is considered an expert on academic tenure, opines that Defendant departed from the normative standards of the academic community as well as the College's official policy requiring the tenured educator be afforded a fair and impartial process. (Ex. P-16, Kreiser Report.)

## DECLARATIONS/AFFIDAVITS

198.   Paul King-Allen provided a sworn statement concerning retaliation he alleges he was subjected to by President Mellichamp as a result of reporting sexual abuse as a minor at Piedmont. (Ex. P-71, King-Allen Decl.)

199.   Dr. Rick Austin provided a sworn statement alleging inappropriate conduct towards students by the college President and describes the sexual harassment, assault, and retaliation he alleges he was subjected to by President Mellichamp as well as the fact that he has observed President Mellichamp fail to comply with Title IX. (Ex. P-72, Austin Aff. 1.)

200.   Dr. Rick Austin provided a second sworn statement alleging Title IX retaliation he alleges he was subjected to by President Mellichamp as a result of testifying on behalf of Plaintiff in this litigation and making a Title IX complaint. (Ex. P-72, Austin Aff. 2.)

201.   Dr. Rick Austin filed a lawsuit bringing claims under 42 USC §1985 alleging retaliation as a result of testifying in Plaintiff Dr. Wainberg's lawsuit. (Ex. P-74, Austin lawsuit.)

202.   Taylor Brown provided a sworn statement concerning her allegations against President Mellichamp, who she says subjected her to retaliation after she made a complaint of sexual harassment against her coach, and that she personally

filed a Title IX complaint against this coach along with President Mellichamp and was denied a Title IX hearing in response. (Ex. P-76, T. Brown Decl.)

203.   Heather Brown provided a sworn statement concerning her allegation that her daughter was subjected to Title IX violations by President Mellichamp who they filed a Title IX complaint against individually alleging retaliation. (Ex. P-77, H. Brown Decl.)

204.   Dr. Dale Van Cantfort provided a sworn statement concerning the faculty's vote of no confidence against President Mellichamp for reasons that include the Title IX litigation and policy violations. (Ex. P-78, Van Cantfort Decl.)

205.   The faculty called for the President's resignation for reasons that include having to do with his sexual misconduct and Title IX violations. (Ex. P-33, Brian Wellmeier, *Piedmont in crisis, trustees to gather Monday*, THE NORTHWEST GEORGIAN, (June 17, 2022), https://etypeproductionstorage1.blob.core.windows. net/$web/Production_Prod/Jobs/238/2022-06-16/288019/PreProcessedPDF/ nrgr_284416_prep_20220616173928438.pdf.)

206.   Former Piedmont Provost and Senior Vice President for Academic Affairs Dr. Dan Silber provided a sworn statement alleging that he resigned due to unethical conduct by President Mellichamp that includes Title IX violation concerns including retaliating against a faculty member who brought forward Title IX

concerns and was wrongfully terminated as a result. (Ex. P-81, Silber Decl.)

207.   Former Piedmont Faculty Member Dr. Carson Webb provided a sworn statement alleging that he reported his Title IX concerns regarding a male faculty member's inappropriate conduct towards a female and was subsequently retaliated against and left the institution due to President Mellichamp's ethical misconduct. (Ex. P-68, Webb Decl.)

208.   Dr. William Benjamin Cash provided a sworn statement alleging sexually inappropriate conduct by President Mellichamp. (Ex. P-75, Cash Aff.)

209.   Nikolai Peek provided a sworn statement alleging a sexually inappropriate comment made by President Mellichamp. (Ex. P-82, Peek Decl.)

210.   Cameron Johnson provided a sworn statement alleging he was a student of Dr. Wainberg's, that Dr. Wainberg was a fantastic teacher, and that he never observed Dr. Wainberg engaging in sexual harassment. (Ex. P-83, Johnson Aff.)

211.   Jerry Thomas Looney provided a sworn statement alleging he was a student of Dr. Wainberg's, that Dr. Wainberg was a good educator, and that he never observed Dr. Wainberg engaging in sexual harassment. (Ex. P-84, Looney Aff.)

212.   Kevin Hall provided a sworn statement alleging he was a student of Dr. Wainberg's, that Dr. Wainberg was one of the best teachers at Piedmont, and that he never observed Dr. Wainberg engaging in sexual harassment. (Ex. P-85, Hall Aff.)

213.   Tristan Rowell provided a sworn statement alleging she was a student of Dr. Wainberg's, that Dr. Wainberg was a good mentor and teacher, and that she never observed Dr. Wainberg engaging in sexual harassment. (Ex. P-86, Rowell Aff.)

214.   Austin Miller provided a sworn statement alleging he was a student of Dr. Wainberg's, that Dr. Wainberg was a great teacher, and that he never observed Dr. Wainberg engaging in sexual harassment. (Ex. P-87, Miller Aff.)

215.   David Craft provided a sworn statement alleging he was a student of Dr. Wainberg's, that Dr. Wainberg was a good teacher who genuinely cared about his students, and that he never observed Dr. Wainberg engaging in sexual harassment. (Ex. P-88, Craft Aff.)

216.   Keelan Passmore provided a sworn statement alleging he was a student of Dr. Wainberg's, that Dr. Wainberg was a passionate teacher and one of his favorite professors because Dr. Wainberg's classes were interesting and engaging, and that he never observed Dr. Wainberg engaging in sexual harassment. (Ex. P-89, Passmore Aff.)

217.   Daniel Whitson provided a sworn statement alleging he was a student of Dr. Wainberg's, that Dr. Wainberg was a good teacher and advisor that cares about his students and their success, and that he never observed Dr. Wainberg

engaging in sexual harassment. (Ex. P-90, Whitson, Aff.)

218.    Tabea Soelter provided a sworn statement alleging she was a student of Dr. Wainberg's, that Dr. Wainberg was a really good teacher, and that she never observed Dr. Wainberg engaging in sexual harassment. (Ex. P-91, Soelter Aff.)

Respectfully submitted, this 8th day of July 2022.

**WILLIAMS OINONEN LLC**

/s/ JULIE OINONEN
Julie Oinonen (Ga. Bar No. 722018)
*Counsel for Plaintiff*

44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
(404) 654-0288/ (404) 592-6225 FAX
julie@goodgeorgialawyer.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared using Times New Roman 14-point font in compliance with Local Rule 5.1.

<u>/s/ JULIE OINONEN</u>
Julie Oinonen (Ga Bar No. 722018)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a true and correct copy of the foregoing PLAINTIFF'S STATEMENT OF MATERIAL FACTS with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

> Joseph C. Chancey
> Barbara A. Marschalk
> Meredith R. Guerrero
> Drew Eckl & Farnham, LLP
> 303 Peachtree St. NE, Suite 3500
> Atlanta, Georgia 30308
> jchancey@deflaw.com
> bmarschalk@deflaw.com
> mguerrero@deflaw.com

> Patrick W. McKee
> Law Office of Patrick W. McKee, LLC
> 19 Spring Street
> Newnan, GA 30263
> pwmckee@mckeelaw.com

> *Counsel for Defendant Piedmont University*

Respectfully submitted, this 8th day of July 2022.

**WILLIAMS OINONEN LLC**

<u>/s/ JULIE OINONEN</u>
Julie Oinonen (Ga. Bar No. 722018)
*Counsel for Plaintiff*

44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
(404) 654-0288/ (404) 592-6225 FAX
julie@goodgeorgialawyer.com